## Moody *v*. Bibb *et al.*

*Bill in Equity to compel Settlement of Guardian's Accounts.*

1. *Appointment of guardian of lunatic.* — An appointment by the probate court, in 1849, of a guardian for a supposed lunatic, without an inquisition of lunacy, and without notice to the lunatic, is absolutely void.

2. *Liability of guardian of lunatic, acting under void appointment, and settlement of accounts.* — A person who assumes to act as the guardian of a lunatic without authority, or under an appointment by the probate court which is void for want of jurisdiction, may be charged as a trustee *in invitum*, and compelled to account in the chancery court; and he cannot protect himself from such accounting by pleading a former settlement in the probate court, which was void for want of jurisdiction.

3. *Conversion of ward's estate by guardian, or investment in Confederate treasury-notes.* — Under the laws which were in force in this State at the time of the passage of the act approved Nov. 9th, 1861 (Sess. Acts 1861, pp. 53–4), the guardian of a lunatic had no authority to convert or exchange the assets of his ward's estate into Confederate States treasury-notes, or the similar notes issued by the state government existing in Alabama during the war; and that act, being passed by the said illegal state government, could not confer any such authority; nor is such unauthorized conversion validated by the subsequent enactment of February 23, 1866 (Rev. Code, § 2135), entitled "An act for the relief of executors, administrators, guardians, and trustees."

APPEAL from the Chancery Court of Greene.

Heard before the Hon. A. W. DILLARD.

The facts of this case, as stated in the opinion of the court, were these: "The bill was filed by John D. Bibb and others, as the heirs and distributees of the estate of Rufus R. Sims, deceased, against Washington Moody, as the guardian of said Sims in his lifetime, and against William P. May, as the administrator of the estate of said Rufus R. Sims, and others interested in his estate. The assignment of errors, however, seems to confine the contest in this court wholly to the defendant Moody, who is the principal appellant. The object of the bill is, to compel said Moody to account for certain moneys and effects belonging to said Sims before his death, which were in the hands of said Moody at the death of said Sims.

"It appears that said R. R. Sims was a son, and one of the legatees of Edward Sims, deceased; and at the distribution of the estate of said Edward Sims, by his executors, said R. R. Sims being esteemed of unsound mind, upon the petition of the executors for that purpose, Moody was appointed his guardian by the

orphans' court of Tuskaloosa county. This appointment was made on the 21st day of June, 1849. There was no inquisition, or writ of lunacy, issued against said Sims, and no notice of the proceedings given to him. The action of the court on the petition of the executors seems to have been wholly *ex parte*. Under this appointment, Moody gave bond as such guardian, and received several thousand dollars of the moneys and property of said Sims, of which, soon after his appointment, he returned a proper inventory to said probate court; and this, with other property and effects belonging to the estate of said Sims, he held until after the death of said Sims, which occurred in the year 1861.

"After the death of said Sims, said William P. May was appointed administrator of his estate, by the probate court then sitting in the county of Greene, under the rebel government then having control of the State. Thereupon, Moody filed in the probate court sitting in Tuskaloosa county his accounts and vouchers for a final settlement of his said guardianship. This purports to have been done in the year 1863, and his final settlement was completed on the 16th day of April, 1863. On this settlement, the sum of $18,960.90, assets of the estate of said R. R. Sims, was found in Moody's hands. In settlement and discharge of this balance, Moody paid the amount to the administrator in Confederate treasury-notes, or in a similar currency issued by the rebel state government during the late war; and retained in his own hands, and used for his own purposes, the assets of said Sims's estate then in his hands, which consisted of choses in action, such as bills of exchange, and promissory notes, for moneys of his ward loaned out by him during his guardianship, and possibly some money. Upon this final settlement Moody was discharged by the decree of said probate court as said guardian.

" After this, May made a partial settlement of his administration of said estate, in said probate court of Greene county, and paid over to the distributees, or such as would receive it, in such Confederate treasury-notes, their distributive shares of said estate; and where it was not received by the distributees, he deposited the same in said probate court. The complainants in this suit, and possibly some of the other distributees of the estate of said R. R. Sims, refused to receive the treasury-notes thus allotted to them, and left for them with the probate judge; and the decrees in their favor remain unsatisfied.

" Moody set up, as a bar to this suit, the decree discharging him on said final settlement of April 16, 1863; and he insisted that, in the management and conduct of his said guardianship, he acted throughout in good faith, and wholly without fraud. May set up a like defence on his part, and also demurred to the

[Moody v. Bibb.]

bill. The chancellor overruled the defence thus set up, and also the demurrer, and decreed that Moody's appointment as guardian of said Sims was void, and that his said final settlement was also void; and he required said Moody to state an account before the register, as master, of all the assets of the estate of said Sims received by him as such guardian. There were other instructions to the register in stating said account with Moody, which seem to be quite proper, but which it is not necessary at this time to notice. Moody appeals from the chancellor's decree, and here assigns the same as error."

R. CRAWFORD, for the appellant.

J. B. & T. C. CLARK and MORGAN & JOLLY, contra.

PETERS, C. J.— It is not necessary, in the present condition of this suit, to go into any very minute statement of the facts set out in the bill and answers. There is no serious collision in these statements, except upon the allegations charging fraud, which it is not my purpose at present to consider. Taking the undisputed facts set out in the pleadings, did the chancellor err in his decree in the court below, from which this appeal is taken?

This is a suit in chancery. That jurisdiction seeks to enforce the law, but only in such a manner as shall result in the most strict justice to all the parties on both sides, under the law governing their rights. As no law is intended to ultimate in wrong to the citizen, who is also the sovereign, the chancellor sits in a court of equity to dispense the power of the sovereign, to correct the unintended injurious operation of the law, which the sovereign himself would have prevented had it been foreseen. Adams's Eq. Intro. p. xxiii.; 2 Bac. Abr. (Bouv.) p. 684 c; 1 Woodd. Lect. VII. pp. 114, 115, marg.; 1 Story's Eq. ch. 2, § 39, et ubique. This great light in this important jurisdiction may sometimes enable us to do right, which is the law of laws, and what the sovereign authority always must intend.

[The Chief Justice here stated the facts as given above.]

1. The appointment of Moody as the guardian of Rufus R. Sims, by the orphans' court of Tuskaloosa county, in June, 1849, whether for special or general purposes, was clearly void. The court acted without jurisdiction. Sims was not brought before the court in any manner, and had no notice whatever of the proceeding to declare him a lunatic. This was necessary, before he could be put under the restraint of a guardianship, and deprived of the control of his own person and of his property. This appointment was made before the adoption and promulga-

tion of the Code of Alabama.. The proceeding was, therefore, under the law as it existed before the Code was proclaimed. A like case to this came under the judicial notice of this court in 1852, at the June term of that year. This was the case of *Eslava* v. *Lepretre*, 21 Ala. 505. In this latter case, the report shows that a guardian had been appointed for Mrs. Eslava, as a person of unsound mind, on the petition of her husband, by the orphans' court of Mobile county, without first proceeding to have her declared a lunatic. The appointment of the guardian was made before the 7th day of January, 1849, as on that day her guardian was served with subpoena to bring her into court. 21 Ala. 511. In her case, this court said: " This appointment was made upon no other assurance of the fact of Mrs. Eslava's lunacy than the petition of her husband, without notice to her, and without the issue of a writ *de lunatico inquirendo*, and the verdict of a jury thereon. Without the issue of this writ, and the finding of the jury, the county court judge had no power to declare her a lunatic, or to appoint a guardian for her. These proceedings are indispensable to give the county court jurisdiction to make the appointment ; and as they were not had, and the court is one of limited jurisdiction, the proceedings on the appointment of the guardian are *coram non judice* and void. Such being the case, they may be impeached in any court, in a collateral proceeding, in which a party seeks a benefit under them. *Wightman* v. *Karsner*, 20 Ala. 446 ; 10 Peters, 449 ; 13 Peters, 511 ; 6 Wheat. 119 ; 3 How. 762 ; 5 Hill N. Y. 568 ; 11 Wend. 652 ; 8 S. & M. 521 ; 16 Verm. 251." 21 Ala. 504, 522. The appointment, in the case at bar, was precisely similar to that in the case above cited. It was wholly *ex parte*, and therefore void. *McCurry* v. *Hooper*, 12 Ala. 823 ; 5 Pick. 219 ; 14 Mass. 222. Sims should have first been declared a lunatic in some regular way, before any guardian could have been appointed. Clay's Dig. p. 302, §§ 29, 30 ; 12 Ala. 823 ; 21 Ala. 504. Moody was not, then, the guardian of Sims, and the decree of the probate court on his final settlement and discharge was void.

2. But, having assumed to discharge the duties and trusts of a guardian, Moody rendered himself liable to account as such, in any court of the State having jurisdiction to administer such trusts. There can be no doubt that such jurisdiction belongs to a court of chancery. *Hall* v. *Hall*, 43 Ala. 488. The court of probate has no jurisdiction in such a case. No principle is better settled, than that a person, by meddling with trust funds without authority, may make himself a trustee *in invitum*. 2 Story's Eq. §§ 1254 *et seq. ; Wormley* v. *Wormley*, 8 Wheat. 421. If this were otherwise, a person would be allowed to set up one illegal act, in defence of another

[Moody v. Bibb.]

illegal act. This is not to be permitted. One wrong cannot excuse another wrong. *Injuria non excusat injuriam.* Broom's Max. (London ed.) pp. 247, 343, 349. It follows from this, that if Moody undertook to act as the guardian of Rufus R. Sims, he was bound to regulate and limit his acts by the law of his assumed office. He could not go beyond this, and he should not be deprived of any benefits that may spring out of it. *Cunningham* v. *Pool*, 9 Ala. 615; *Wilson* v. *Knight*, 18 Ala. 129. When a person incurs such responsibilities, he may be discharged by complying with the demands of the law, as though his appointment had been regular and legal, in a proper court, or by the act of the ward himself, if he is *sui juris.* The decree of the learned chancellor in the court below does not go beyond this. It is, therefore, free from error in directing an account to be taken.

3. A few words more will dispose of the question raised on the use made of the " Confederate currency." The Code of Alabama was the law that governed the administration of the estates of guardians held as such, and their final settlements and discharge, at the time Moody attempted a settlement as above shown, in June, 1863. It was the law of the rightful and legal government of this State. The enactments of the illegal rebel government could not repeal or alter the Code, which was the law of the legal government. This was one of the points expressly decided in the case of *Texas* v. *White*, 7 Wall. 700, 732. The Code does not permit any investment of a ward's money or property in Confederate securities, or Confederate currency. That issued by the State was illegal. *Hanauer* v. *Woodruff*, 15 Wall. 439. And that issued by the " Confederate government," so called, was a nullity and worthless. *Thorrington* v. *Smith*, 8 Wall. 1, 11, 2d par. from top. It was " one of the agencies resorted to by the adherents of the Confederate government to carry on the war against the United States." SAFFOLD, J., in *Ponder* v. *Scott*, 44 Ala. 241, 246.

The Code did not permit the estates of persons under guardianship to be exchanged into such a currency, without the assent of the ward, given when he was capable of such assent. Then the act of the rebel government purporting to have been approved on November 9, 1861, did not repeal the Code, nor confer authority on Moody to convert the moneys or property of Sims into Confederate treasury-notes. Pamph. Acts 1861, pp. 53, 54. This was an attempt to repeal the Code, which cannot be sustained. 7 Wall. 700, 732. Under the Code, the guardian's powers are carefully defined ; and he cannot go beyond these powers, without a proper order of a proper court. If he does, it is at his own risk, and the loss must fall upon his own head. Rev. Code, § 2426 ; *Hall* v. *Hall*, 43 Ala. 488, and cases there cited.

In a late case in this court, a like question with the present came under discussion. It involved the power of administrators with the will annexed to convert or exchange the bequests of the testator into "Confederate currency," or Confederate securities. This court said : " As the bequests were, or ought to have been, vested on debts well secured, the *onus* is on the administrators to show that they were properly administered. Unless the necessities of the children required the collection of some of the money in Confederate currency, or the threatened insolvency of some of the debtors, or some other equally urgent cause, made it necessary, the property ought not to have been so exchanged. We cannot give any more definite instructions than these contained in the case of *Houston* v. *De Loach*, 43 Ala. 364." *Anderson* v. *McGowen & Wife*, 45 Ala. 462, 470. We feel that the principles thus settled need no modification. They are still adhered to.

After the guardian had committed a waste, or conversion of the ward's estate, under the law as it then existed in the Code, the general assembly, by a subsequent enactment, could not release the guardian from the liability thus incurred, without the consent of the ward, given in some legal manner. Such an act would be void as to past transactions, in which the right of the ward had become vested. The power of the legislature is to protect vested rights, not to impair or destroy them. The remedies to enforce such liabilities may be controlled by statutes of limitations, passed for the public repose. *Interest reipublicæ ut sit finis litigium.* Co. Litt. 303. But the right to life, liberty, and property is sacred, and it cannot be invaded by the legislative power. Decl. of Independence ; Cooley's Const. Limit. p. 351 *et seq. ;* Sedgwick on Stat. & Const. Law, p. 177 *et seq.* So far as the act of the general assembly of this State, entitled " An act for the relief of executors, administrators, guardians, and trustees," approved February 23, 1866, has the effect to sanction unauthorized conversions of the estates of deceased persons, minors, and beneficiaries, into Confederate currency, whether issued by the State or the Confederate States government, so called, it is void. Pamph. Acts 1865-6, p. 714 ; Rev. Code, § 2135 ; *Newman* v. *Reed,* at the present term ; Sedgw. on Stat. & Const. Law, p. 177 ; *Gunn* v. *Barry,* 15 Wall. 610, 622. See, also, *Head* v. *Talley,* opinion by CHASE, C. J., U. S. Cir. Court, Richmond, Va. 1870. Then the attempted payment to the administrator, May, in Confederate currency did not discharge Moody. He is still liable to account.

The judgment of the court below is in conformity with the principles of law above announced ; it is, therefore, affirmed at appellant's costs.